UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SEAN M. SMITH,

               Plaintiff,                            Civil Action No. 2:12-cv-12160

       v.                                 District Judge Marianne O. Battani
                                       Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

**REPORT AND RECOMMENDATION TO**
**DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [13] AND**
**GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [15]**

Plaintiff Sean Smith suffers from psychological impairments. When Smith was a child, Defendant Commissioner of Social Security deemed Smith to be disabled within the meaning of the Social Security Act. After Smith turned 18, however, an Administrative Law Judge acting on behalf of the Commissioner concluded that Smith was not disabled under the Social Security Administration's standards for adults. Smith then sought review from the Administration's Appeals Council; the Council denied Smith's request. Smith now appeals to this Court. (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 2) are the parties' cross-motions for summary judgment (Dkts. 13, 15). As detailed below, this Court finds that Smith has not shown that evidence submitted after the administrative hearing justifies remand, that the ALJ's residual functional capacity assessment lacks substantial evidentiary support, or that relief is warranted for the Appeals Council's apparent failure to consider his brief. The Court will therefore RECOMMEND that Plaintiff's Motion for Summary Judgment (Dkt. 13) be DENIED, that

Defendant's Motion for Summary Judgment (Dkt. 15) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

# I. BACKGROUND

## A. Procedural History

In October 2004, when Smith was almost 15 years old, the Commissioner of Social Security ("Commissioner") determined that he was disabled under the Social Security Act and thus entitled to supplemental security income. (Tr. 314.) Soon after Smith's 18th birthday in October 2007, the Commissioner "redetermined" whether Smith was disabled under adult disability standards. *See* 42 U.S.C. § 1382c(a)(3)(H)(iii); 20 C.F.R. § 416.987(b). The state agency acting on behalf of the Commissioner found that he was not. (Tr. 29.) After this decision was upheld on reconsideration, Smith requested a hearing before an Administrative Law Judge. (*Id.*) On April 6, 2010, he appeared before ALJ James P. Alderisio and testified to the limiting effects of his medical conditions. (Tr. 341-66.) Upon taking Smith's testimony, and performing a *de novo* review of Smith's application and the record, ALJ Alderisio concluded that Smith had not been disabled since February 1, 2008. (Tr. 36.) His May 25, 2010 decision became the final decision of the Commissioner when, in March 2012, the Social Security Administration's Appeals Council denied Smith's request for further administrative review. (Tr. 12.) This suit followed. (Dkt. 1, Compl.)

## B. Medical Evidence

The primary legal claim on appeal guides the structure of the record summary that follows. In particular, Smith says that the ALJ allowed his counsel to submit medical evidence after the April 2010 administrative hearing, but, despite supplying post-hearing records, the ALJ did not consider those records in making his disability determination. Given this claim of error, the Court separately

2

summarizes the evidence that was part of the record before the administrative hearing, and then turns
to the post-hearing evidence that Smith claims the ALJ overlooked.

### 1. Evidence Part of the Record Before the Administrative Hearing

The administrative record begins with an October 2002 neuropsychological examination
report. (Tr. 192-205.) Smith was then nearly 13 years old and about to start the seventh grade. (Tr.
192.) Upon completion of the exam, Brandon Davis, Ph.D., a neuropsychologist, concluded that
Smith was of average intelligence, but had "relative weakness with Psychomotor Speed, Expressive
Language Abilities, and Social Comprehension." (Tr. 192.) According to Dr. Davis, Smith exhibited
"[c]ognitive neuropsychological dysfunctions . . . in areas of perceptual motor organization skills
with paper and pencil tasks, psychomotor speed, short-term memory skills, and expressive language
skills." (*Id.*) Regarding Smith's emotional status, Dr. Davis opined that Smith had "frank depressive
features," "conduct disordered behavior," "impulse control problems," and "attention and
concentration deficits." (Tr. 193.)

Although the corresponding records are not part of the transcript, at age 14, Smith was
hospitalized for hearing voices and threatening his step-brother with a knife. (*See* Tr. 217.)

In July 2005, a psychotic episode placed Smith, then 15, in the hospital for nine days. (Tr.
208-20.) Smith was "[i]llogical during the [medical] interview, jumping from topic-to-topic and
argumentative." (Tr. 208.) "He says he sticks his fingers up his anus, pulls feces out an[d] licks it.
Also allegedly plays with fire." (Tr. 208.) A physician's mental status exam notes provide:

> The patient has good hygiene but is agitated with disorganized
> thoughts and argumentative. He has pressured speech and
> spontaneously out of the blue says, "My favorite number is 666." . . .
> [He] [s]ays, "I just hear my grandfather's voice and no one is gonna
> take that away from me." Very labile mood and irritable. Oriented to
> date, place, and person. Remembers 3 items after 3 minutes, and

3

> recalls 5 items. Knows past president but is very inattentive. Says the
> saying, ["]the grass seems greener on the other side of the fence,["]
> means, "The other person takes better care of their lawn." . . .
> Correctly subtracts 7 from 100. IQ estimate[d] [as] average. . . .

(Tr. 210.) Smith's Global Assessment Functioning score upon admission was only 11; at discharge

the attending physician thought that it had improved to 40. (Tr. 208, 209.)[1] Treatment included

future counseling and prescriptions for Paxil, Concerta, Trileptal, Clonidine, and Desyrel. (Tr. 208.)

In January 2006, Smith, accompanied by his mother, went for a medication review at the

Professional Counseling Center ("PCC"), the facility where Smith would ultimately receive the vast

majority of his mental-health treatment. Smith's mother told the psychiatrist, whose signature is

illegible, that Smith was back on his medications because he was very "difficult to control." (Tr.

262.) She further reported that Smith engaged in non-stop talking and was demanding and defiant.

(*Id.*) Smith was directed to continue on his medications. (*Id.*)

The next month, a therapist at the PCC noted that Smith had symptoms of oppositional

defiant disorder (Tr. 257), a disorder characterized by "a persistent pattern of tantrums, arguing, and

angry or disruptive behavior toward [parents] and other authority figures," Mayo Clinic,

*Oppositional Defiant Disorder*, http://www.mayoclinic.com/health/oppositional-defiant-disorder/

---

[1]A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV* "), 30-34 (4th ed., Text Revision 2000). A score of 11 to 20 indicates "[s]ome danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)." *DSM-IV* at 34. A GAF score of 31 to 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *DSM-IV* at 34.

4

DS00630 (last visited July 10, 2013). Although Smith's prognosis was "poor," the therapist assigned a GAF score of 53. (Tr. 258.)

In July 2006, Smith returned to the PCC psychiatrist he had seen in January. (Tr. 260.) The psychiatrist noted that Smith had been suspended from his high school for defiance and insubordination. (Tr. 260.) The psychiatrist further provided that Smith was not "motivated for treatment," that he would not prescribe any more medications, and that Smith should follow up with his primary-care physician for his ADHD medication (Concerta). (*Id.*)

By August 2006, however, Smith's attitude had changed: he told the PCC psychiatrist that he wanted to try medications for his "moods." (Tr. 259.) The psychiatrist prescribed Seroquel. (*Id.*)

In December 2006, Smith was discharged from treatment at PCC. (Tr. 252.) His diagnosis was still oppositional defiant disorder, but the discharge summary noted that Smith was "stable" at his last appointment, and that Smith had decreased his impulsivity, acting out, and skipping school. (Tr. 253.)

In September 2007, Smith returned to the PCC therapist from whom he had previously received treatment. (Tr. 266-69.) Smith, or his parents, reported that Smith had been suspended from school for fighting. (Tr. 266.) It appears that Smith wanted to learn how to manage his anger such that he could join the military when he turned 18. (Tr. 264.) The therapist's plan was to refer Smith to an anger management program to support the gains that Smith had made during the prior year, and to help Smith improve his impulse control skills. (Tr. 269.)

In December 2007, Smith told Dr. Jun Garcia, his primary-care physician, that he would like to increase his prescription of Seroquel but stop Concerta. (Tr. 279.) Smith's reason: he wanted to be off of the medication for one year so that he could try to join the armed forces. (*Id.*) Dr. Garcia's

"[a]ssessment/plan" was bipolar disorder, history of chronic disorder, a referral to psychiatry for Seroquel titration, and to discontinue Concerta. (*Id.*) Later in December Smith was discharged from therapy at the PCC. (Tr. 263.) Smith was described as stable and "demonstrating good impulse control." (*Id.*)

In early February 2008, Smith saw Dr. Garcia for poor sleep and "anger issues." (Tr. 277.) Dr. Garcia noted that despite these problems, Smith refused to take any medication except Seroquel. (*Id.*) Garcia's assessment/plan was mood liability, "[q]uestion element of depression," and a prescription of Seroquel. (*Id.*)

As noted, Smith turned 18 years old in October 2007; accordingly, in February 2008, for purposes of determining whether Social Security benefits should continue, Smith underwent a consultative exam with Michelle Rousseau, Psy. D. (Tr. 221-25.) Smith described symptoms relating to four disorders: attention deficit hyperactivity disorder ("ADHD"), oppositional defiant disorder, psychotic disorder, and major depressive disorder. (Tr. 221-22.) Regarding his ADHD, Smith stated that while he was still having problems sitting still, concentrating, and controlling his impulses, his symptoms were less severe than when he was younger: "I've learned to control it." (Tr. 221.) As for his oppositional defiant disorder, Smith told Dr. Rousseau: "I'm always defiant till the end. I'm always arguing." (*Id.*) Although slightly ambiguous as to whether Smith was describing past or then-present psychotic symptoms, he reported that he sometimes did things (e.g., stealing pills) that he could not remember doing. (*Id.*) Smith stated that he no longer heard voices, save for that of his deceased grandfather with whom he still enjoyed conversing. (Tr. 224.) As for his depression, Smith said that his last episode occurred three days prior to the exam, after being off Concerta for three months. (Tr. 222.) Despite these reported symptoms, Smith also told Dr. Rousseau that he was

active:

>housekeeping (dishes, sweeping, mopping, vacuuming), gardening, yard work, laundry, cooking simple and complex meals, watching television and movies, taking walks, exercising (lifting weights 1-2 times per week, squatting, bench presses, bar bells, etc.), socializing with friends, running errands, making appointments, playing video games, feeding and watering his dogs and birds, managing a fire pit, reading books, drawing, writing, and talking on the internet with friends online.

(Tr. 222.) Smith qualified, however, that his parents did not allow him to go "anywhere" for fear that he would do something "stupid." (*Id.*) Smith agreed with the restriction, noting that venturing out might land him in jail. (*Id.*)

On exam, Dr. Rousseau found that Smith could remember five numbers forward and four backward, and recall three out of three items after three minutes. (Tr. 224.) Smith could also, for the most part, complete the serial sevens test (requiring repeating subtracting seven starting from 100). (*Id.*) Smith did not appear to be troubled by his paranoid thoughts and his mood was described as euthymic. (Tr. 225.) Dr. Rousseau also opined that Smith's "[c]oncentration difficulties appeared mild, and did not appear to substantially impair his functioning." (*Id.*) She assigned a GAF score of 60.

In April 2008, Smith returned to Dr. Garcia for a well-child check. (Tr. 274.) Dr. Garcia remarked, "He has an underlying history of ADHD, bipolar depression . . . and history of conduct [d]isorder which is fairly well-controlled at this time." (*Id.*)

In July 2008, Dr. Kokila Sheth reviewed Smith's medical file and then completed a Psychiatric Review Technique form ("PRTF") and a Mental Residual Functional Capacity assessment form ("MRFC"). (Tr. 231-48.) On the PRTF, Dr. Sheth provided that Smith had "mild" limitations in his activities of daily living, and "moderate" limitations in social functioning and

7

maintaining concentration, persistence, or pace. (Tr. 241.) On the MRFC form, Dr. Sheth opined that Smith retained the mental residual functional capacity to do "simple unskilled work on [a] sust[ained] basis." (Tr. 247.) He added, however, that Smith should avoid excessive social interaction. (*Id.*)

Although Smith's principal basis for appeal relates to his mental impairments, the record does reflect some treatment for physical conditions. At the well-child check in April 2008, Dr. Garcia provided that Smith had a "history of chronic low back pain" and "mild scoliosis." (Tr. 274.) In September 2009, someone in Dr. Garcia's office noted right knee pain and something about an MRI or x-ray. (Tr. 271.) In the fall of 2009, Smith participated in physical therapy with Shipa Mehta to treat his low-back and right knee pain. (Tr. 292-303.)  At the initial appointment, Smith, in response to a list of 24 activities, indicated that sleeping for at least six hours and lifting forty pounds was "very difficult" and that walking several miles, bending over a sink for 10 minutes, and moving a table were "fairly difficult." (Tr. 293.) The other activities were identified as "somewhat," "minimally," or "not" difficult. (*Id.*) Smith discharged himself from physical therapy after ten sessions; his pain during activity had reduced from an eight out of ten to a six out of ten. (Tr. 285.)

### 2. Evidence Submitted Post-Hearing

The post-hearing medical evidence begins with an October 2009 "Clinical Assessment" at PCC. (*See* Tr. 327-32.) According to the assessing counselor, whose name is illegible, "[Smith] comes to counseling because he wants to get back on [medications] [and] he is attempting to secure [supplemental security income]." (Tr. 329.) Smith also wanted to better control his moods, anger, and "understand why he is the way he is." (*Id.*) Smith described himself as a "dark neo-pagan" and reported seeing "angels/demons/dragons." (Tr. 331.) Smith said that he felt angry and hostile when

8

having to deal with people, but calm and serene when playing video games and chatting online, "which [was] how he spen[t] most of his time." (*Id.*) The counselor checked boxes corresponding to Smith's "psychological/emotional symptoms/mental status," including anger, impaired concentration, impulsiveness, irritability, and oppositionalty. (Tr. 329.) The counselor diagnosed bipolar I disorder, most recent episode manic, with psychotic features. (Tr. 331.) She assigned a GAF score of 45. (Tr. 332.)[2] It appears that Smith's prior therapist (from 2007) also signed the assessment. (*Id.*)

The PCC therapy notes that follow the October 2009 assessment say little about the functional limitations that Smith was then experiencing due to his mental impairments. In his October 2009 therapy sessions, Smith acknowledged that much of his anger stemmed from frustration. (Tr. 326.) He told his counselor that he felt like a failure and that he did not live up to his mother's expectations. (*Id.*) Smith believed that boredom and frustration resulted in stress, which then caused anger issues. (Tr. 325.) The counselor noted that Smith would try to find a copy of his anger-management certificate and look into a GED course. (*Id.*) At the first of three November 2009 sessions, Smith discussed his anger toward his mother. (Tr. 324.) At the second, Smith reported moving out of his mother's home following a verbal altercation. (Tr. 323.) At the third November session, Smith reported that it was important to him to help others and be taken seriously. (Tr. 322.)

On November 23, 2009, Smith was discharged from therapy. The counselor's discharge diagnosis was the same as at intake: bipolar I disorder, most recent episode manic, with psychotic features. (Tr. 320.) He or she again assigned a GAF score of 45. (*Id.*)

---

[2]A GAF score of 45 to 50 reflects "serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e .g., no friends, unable to keep a job)." *DSM-IV* at 34.

The post-hearing evidence also includes an April 2010 note written by Dr. Jun Garcia, Smith's long-time primary-care physician. (Tr. 319.) The note says, "[Mr. Smith] is under my care for bipolar and ADHD. He also receives prescriptions from me for the treatment of bipolar and ADHD." (*Id.*)

### C. Testimony at the Hearing Before the ALJ

Smith's testimony at his April 2010 hearing before ALJ Alderisio was fairly limited. Smith, who was expelled from school during the 10th grade (Tr. 350, 353), provided that his "grades were good in all but history," but that classes were difficult because of his attention span (Tr. 348-49). When the ALJ asked if Smith had attempted to obtain any of the manufacturing jobs in his area, Smith responded, "I tried. [A]ll of them said I need a high school diploma or a GED." (Tr. 353.) Apparently referring to the time period around his 18th birthday, Smith reported that he had stopped his medications for about a year "because [he] wanted to join the armed forces." (Tr. 349.) Smith said that he was not accepted into the military because of his "bipolar, psychotic, and my physical disabilities." (Tr. 349.) The last was a reference to Smith's right knee and scoliosis. (Tr. 349, 357.)

At the time of the hearing, Smith was living with his girlfriend and her four-year-old child and his girlfriend's friend and her three-year-old child. (Tr. 355.) When the ALJ asked what Smith did all day, Smith explained, "I mainly help with [the] two children. . . . I help keep the house clean. I [have] been lately getting the bills, what we need, turned on. I [have] been trying to get back into counseling." (Tr. 356.)

Smith's counsel added that Smith's primary problem was "sustainability." (Tr. 350.) She noted that Smith had gone to anger management courses on three occasions. Counsel continued, "our argument . . . right now [is] he has not the ability to sustain work because he cannot stay on-

task or his emotions and explosiveness." (Tr. 350-51.)

At the hearing, the ALJ asked a vocational expert whether jobs would be available for various hypothetical individuals with functional limitations like Smith's. The ALJ first asked about job availability for a hypothetical individual who, physically, was capable of non-driving, "medium" exertion tasks on "level ground," and who, mentally, was "task-oriented" and capable of simple one or two step instructions in a low-stress environment; the ALJ further qualified that this person would be unable to "deal with the public," and was "severely limited but not precluded in dealing with coworkers." (Tr.357.) The vocational expert stated that there would be positions for such an individual in southeast Michigan, including, packager, janitor, stocker, and a kitchen or food worker. (Tr. 358.) The ALJ then asked about a second individual, limited in the same way as the first except that the hypothetical person could perform only "light" exertion. (Tr. 361.) The expert stated that there would still be jobs: cleaning or janitorial and simple inspector. (*Id.*)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to
> last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

Where, as here, a "redetermination" is at issue, the following four step sequential analysis for determining disability applies. *See* 20 C.F.R. § 416.987(b); *Wagner v. Comm'r of Soc. Sec.*, No. 1:091115, 2010 WL 3036763, at *3 n.5 (N.D. Ohio July 15, 2010), *report and recommendation*

11

*adopted*, 2010 WL 3000220 (N.D. Ohio July 30, 2010). First, a claimant must have a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *Wagner*, 2010 WL 3036763, at *3 n.5. If the claimant has such an impairment, the ALJ proceeds to step two and determines whether the claimant's impairments meet or medically equal an impairment listed in 20 C.F.R. Pt. 404, Supbt. P, App'x 1; if so, the claimant is presumed disabled without further inquiry. *Walters*, 127 F.3d at 529; *Wagner*, 2010 WL 3036763, at *3 n.5. If not, at step three the ALJ determines the claimant's residual functional capacity: the most the claimant can still do despite his impairments. *Walters*, 127 F.3d at 529; *Wagner*, 2010 WL 3036763, at *3 n.5. At step four, the ALJ determines whether the claimant's residual functional capacity would permit the claimant to perform his past relevant work. *Walters*, 127 F.3d at 529; *Wagner*, 2010 WL 3036763, at *3 n.5. If so, the ALJ should find that the claimant is not disabled. Otherwise, the burden shifts to the Administration at step five, *see Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994), where the ALJ, often with the aid of a vocational expert, must find that the claimant can perform other jobs that exist in substantial numbers. *Walters*, 127 F.3d at 529; *Wagner*, 2010 WL 3036763, at *3 n.5. If the Administration cannot carry its burden, the claimant should be deemed disabled; if it can, the claimant is not disabled. *Walters*, 127 F.3d at 529; *Wagner*, 2010 WL 3036763, at *3 n.5.

Applying this sequential analysis, ALJ Alderisio found that Smith had the following severe impairments: "psychotic disorder, not otherwise specified, a history of attention deficit hyperactivity of a combined type, a history of a major depressive disorder, in full remission, back pain, and right knee pain." (Tr. 31.) Next, he concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 32.) At step three, the ALJ determined that Smith

had the residual functional capacity to "perform medium work as defined in 20 CFR 416.967(c) except requiring flat, level ground only, no useful ability to deal with the public, very limited but not precluded dealing with coworkers, being limited to simple, one or two step job instructions, task oriented, being restricted to low stress work, and no driving." (Tr. 32.) At step four, the ALJ found that Smith had no past relevant work. (Tr. 35.) At step five, he found that sufficient jobs existed in the national economy for someone of Smith's age, education, work experience, and residual functional capacity. (Tr. 35.) The ALJ therefore concluded that Smith was not disabled as defined by the Social Security Act from February 1, 2008 through the date of his May 25, 2010 decision. (Tr. 36.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th

13

Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

Smith contends that the Commissioner's disability decision is in error for three reasons. He says that this case should be remanded to the Appeals Council because the Council denied his request for review without considering the brief he submitted in support of his request. (Dkt. 13, Pl.'s Mot. Summ. J. at 10-11.) He also claims that the ALJ's residual functional capacity assessment is inaccurate. (*Id.* at 11-15.) Third, Smith asserts that this case should be remanded to an ALJ to reconsider the record as supplemented by the evidence he submitted after his administrative hearing. (*Id.* at 8-10.) As this last assertion appears to be Smith's primary claim of error, the Court will address it first.

14

**A. The ALJ's Failure to Consider Smith's Post-Hearing Evidence Was Harmless Error**

The record supports Smith's claim that the ALJ granted him the right to submit evidence after the administrative hearing, that he submitted the evidence within the time allowed, and that the ALJ did not consider the records. At the April 6, 2010 administrative hearing, Smith's counsel told the ALJ that PCC had not provided all of Smith's records, including records from 2009. (Tr. 346.) The ALJ responded, "You need 20 days for attorney medical?"; Smith's counsel replied, "Yes." (*Id.*) Then, toward the end of the hearing, the ALJ granted counsel's request: "Get me the medical records, the updated medicals and the psychologicals, and then I'll review the case again cover to cover." (Tr. 364.) It appears that the post-hearing evidence was timely received on April 15, 2010—before the 20-day window closed. (*See* Tr. 312.) But, as Smith claims, it appears that the ALJ did not consider these records. The ALJ's narrative discusses none of the records submitted after the hearing. (*See generally* Tr. 29-36.) It does not even mention the receipt of additional records. (*See generally id.*) Indeed, the Commissioner acknowledges that the "ALJ did not discuss these records." (Def.'s Mot. Summ. J. at 7, 8.) Accordingly, on the record and arguments presented, the strongest inference is that the ALJ timely received but did not consider the post-hearing evidence.

The focus thus becomes the legal consequence of the ALJ's omission. Smith cites 20 C.F.R. § 416.927(b) and 20 C.F.R. § 416.945(a)(3) for the proposition that, while there is no requirement for an ALJ to discuss every record, "the ALJ is at least required to *consider* every piece of evidence." (Dkt. 16, Pl.'s Resp. at 2; *see also* Pl.'s Mot. Summ. J. at 8-9.) The Court agrees with Smith that an ALJ must base his or her disability determination on the entire record. *See* 20 C.F.R. § 416.920b ("After we review all of the evidence relevant to your claim, including medical opinions (see § 416.927), we make findings about what the evidence shows."); 20 C.F.R. § 416.945(a)(3)

15

("We will assess your residual functional capacity based on all of the relevant medical and other evidence."); S.S.R. 96-8p, 1996 WL 374184, at *5; S.S.R. 06-03p, 2006 WL 2329939, at *1 ("In accordance with sections 223(d)(5) and 1614(a)(3)(H) of the Act, when we make a determination or decision of disability, we will consider all of the available evidence in the individual's case record.").

A general rule of appellate review, however, is that remand is not required unless the ALJ's error was harmful. *Rabbers v. Comm'r Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally . . . we review decisions of administrative agencies for harmless error. . . . Accordingly, if an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)). And here, Smith has not persuaded the Court that the ALJ's failure to consider the post-hearing evidence was harmful. *See Shinseki v. Sanders*, 556 U.S. 396 (2009) (holding that the burden is on the party attacking the Department of Veterans Affairs' decision to prove that Department's error was not harmless); *McLeod v. Astrue*, 640 F.3d 881, 887 (9th Cir. 2010) (applying the holding in *Shinseki* to social security disability cases).

Before examining the import of the post-hearing evidence, it is critical to note that what was already in the record strongly supports the ALJ's disability determination. Smith faults the ALJ for relying "almost entirely upon the findings of consultative psychologist Michelle Rousseau, Ph.D." (Pl.'s Mot. Summ. J. at 12.) But, after the alleged onset of date of February 1, 2008, Drs. Rousseau, Sheth, and Garcia were the only "acceptable medical sources," *see* 20 C.F.R. § 416.913(a), who offered any information about Smith's mental or emotional impairments. And, in contrast to

16

Garcia's brief notes (summarized above), Dr. Rousseau offered a lengthy report on Smith's condition. (*See* Tr. 221-25.) Upon completion of what appears to be a thorough consultative exam, Dr. Rousseau thought that Smith did not appear to be troubled by his paranoid thoughts, that his mood was euthymic, and that his "[c]oncentration difficulties appeared mild, and did not appear to substantially impair his functioning." (Tr. 225.) Dr. Sheth's opinion is in accord with Dr. Rousseau's. Although Smith attempts to shift the focus to Dr. Sheth's "moderate" functional limitations (Pl.'s Mot. Summ. J. at 13), the ALJ's attention rightly remained on Dr. Sheth's ultimate "functional capacity assessment": that Smith was able to follow directions and retained the mental residual functional capacity to do simple, unskilled work on a sustained basis (Tr. 247). Together, Dr. Rousseau and Dr. Sheth's statements weigh heavily in favor of the ALJ's disability determination.

The post-hearing evidence does little to tip the scales in favor of Smith. Among the post-hearing evidence, the October 2009 "Clinical Assessment" is perhaps the most probative as it indicates symptoms (e.g., impaired concentration, impulsiveness, oppositionalty) related to Smith's ability to work. (Tr. 329.) But that assessment was completed by a "limited-licensed professional counselor" (Tr. 332), which is not an "acceptable medical source," 20 C.F.R. § 416.913(a). Thus, absent some unique familiarity with Smith's condition, the counselor's opinion must be accorded less weight than a similar opinion of a physician, psychologist, or psychiatrist, for instance, Drs. Rousseau and Sheth. S.S.R. 06-03p, 2006 WL 2329939, at *5 (noting that, while a non-acceptable medical source opinion can sometimes be accorded more weight than that of an acceptable medical source, "a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight"). And it does not appear that the intake counselor had any special

17

knowledge of Smith's condition. For one, the counselor's assessment was based on his or her first interaction with Smith. S.S.R. 06-03p, 2006 WL 2329939, at *4 (providing that a factor for weighing an opinion is "[h]ow long the source has known and how frequently the source has seen the individual"). For another, the counselor's notation of symptoms, for example "impaired concentration," appears to be based almost exclusively on Smith's self reporting. *See id.* (providing that a factor for weighing an opinion is "[t]he degree to which the source presents relevant evidence to support an opinion"); *cf. Bell v. Barnhart*, 148 F. App'x 277, 285 (6th Cir. 2005) ("There is no indication that Dr. McFadden's opinion was supported by anything other than Bell's self-reports of his symptoms. Such reports alone cannot support a finding of impairment."). On this last point, it is telling that Smith reported prior diagnoses of ADHD, psychotic disorder, and bipolar disorder, and the counselor's diagnosis echoed Smith's report: "Bipolar I Disorder, Most Recent Episode Manic [with] Psychotic Features." (Tr. 331.) The counselor even expressed doubt as to the accuracy of Smith's bipolar diagnosis: "[Client] describes a [history] of manic episodes [without] 1 reported 'depressive' that does not fully meet the criteria of a depressive episode." (Tr. 331.) The counselor wanted Smith to undergo a "psychiatric evaluation for a [diagnosis]." (Tr. 332.) Moreover, the counselor indicated that Smith was motivated for treatment not only because of his symptoms but because he was "attempt[ing] to secure SSI." (Tr. 329.) This suggests that Smith's symptoms were not so severe in 2009 that he would have sought treatment solely for that reason. Together, these reasons justify giving much less weight to the October 2009 "Clinical Assessment" from PCC than the evidence in the record supporting the ALJ's decision.

The same can be said for the remaining post-hearing PCC records. Other than the October 2009 assessment, the post-hearing PCC records consist of notes from six therapy sessions and a

discharge summary. (Tr. 320-26.) The therapy notes simply recount what Smith discussed during his sessions. (*See id.*) To the extent they comment upon Smith's functioning, three notes indicate that Smith's mood and affect were "appropriate" or "appropriate to session" (Tr. 323, 324, 326), while only one note indicates that Smith's mood was "labile" (Tr. 322). Regarding the discharge summary, Smith's counselor only opined on his condition by providing that Smith's diagnosis and GAF score were the "same" as at the initial assessment. (Tr. 320.) Although the counselor had now become more familiar with Smith's condition, his or her diagnosis, standing alone, says little about Smith's ability to function in a work environment. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition."). Regarding the counselor's GAF score, although it was low, such scores are of limited probative value in a Social Security disability analysis. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("Because the final GAF rating always reflects the worse of [severity of symptoms and functional level], the score does not reflect the clinician's opinion of functional capacity." (internal quotation marks and citation omitted)); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006) ("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place. . . . If other substantial evidence (such as the extent of the claimant's daily activities) supports the conclusion that she is not disabled, the court may not disturb the denial of benefits to a claimant whose GAF score is as low as Kornecky's [40-45, 46, 52, 50-55] or even lower."); *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 415 (6th Cir. 2006) ("[T]he Commissioner 'has declined to endorse the [Global Assessment Functioning] score for use in the Social Security and [Supplemental Security Income] disability programs, and has indicated that [Global Assessment Functioning] scores have no direct correlation to the severity

19

requirements of the mental disorders listings.'" (quoting *Wind v. Barnhart*, No. 04-16371, 2005 WL 1317040, at *6 n.5 (11th Cir. June 2, 2005))).

As for Dr. Garcia's April 2010 note, it says even less about Smith's ability to function than the post-hearing PCC records. It simply informs that Dr. Gracia, who was not a psychiatrist or psychologist, was treating Smith for bipolar and ADHD. (Tr. 319.) It says nothing about the severity of those conditions or Smith's ability to function with treatment. (*Id.*)

In sum, the post-hearing evidence is of limited probative value on the issue before the ALJ: Smith's ability to function in a work environment despite his mental impairments. In contrast, the evidence that the ALJ did review is much more probative on that issue. And that evidence strongly suggests that Smith was not disabled after February 1, 2008. Thus, although the ALJ should have considered Smith's post-hearing evidence, the Court finds that failure did not result in error warranting remand.[3]

_____

[3]In a footnote, Smith asserts that if the ALJ's failure to consider his post-hearing evidence "somehow inexplicably transform[s] timely-submitted medical evidence into 'new and material evidence,'" this Court "should remand this matter for consideration of these materials" pursuant to sentence six of 42 U.S.C. § 405(g). (Pl.'s Mot. Summ. J. at 12-13 n.3.) Largely for the reasons just provided, Smith has not persuaded the Court that his post-hearing evidence meets the "new" and "material" requirements for a sentence six remand. *See Wilson v. Comm'r of Soc. Sec.*, No. 10-13828, 2011 WL 2607098, at *6 (E.D. Mich. July 1, 2011) (providing that "new" evidence must not be merely cumulative of evidence already part of the record); *Carroll v. Califano*, 619 F.2d 1157, 1161 (6th Cir. 1980) ("[W]here the issue in question has already been fully considered, further evidence on that point is merely cumulative"); *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988) (providing that evidence is "material" only if there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence.").

**B. The Appeals Council's Failure to Consider Smith's Brief Does Not Justify Remand**

Smith claims that the Appeals Council granted him a 25-day extension to file a brief and that he filed his brief within the time allowed. (Pl.'s Mot. Summ. J. at 10.) Yet, says Smith, the Appeals Council failed to consider his January 2012 brief. (*Id.* at 10-11.)

As proof, Smith notes that the Appeals Council's letter lists a number of post-hearing documents that the Council considered while conspicuously omitting the January 2012 brief. (*See* Pl.'s Mot. Summ. J. at 10-11; Tr. 15.) According to Smith, the inference is that, because the brief is not listed while other documents were, it was not considered. (*See* Pl.'s Mot. Summ. J. at 10-11.) The Commissioner responds that "it is not clear whether Appeals Council considered the January 9, 2012 letter," and then argues that the Council's omission is not reversible error. (*See* Dkt. 15, Def.'s Mot. Summ. J. at 10-11.) Because the Court can resolve this claim of error while accepting Smith's account, the Court proceeds under the assumption that the Appeals Council overlooked Smith's timely submitted January 2012 brief.

The legal basis for Smith's argument is 20 C.F.R. § 416.1475. (Pl.'s Mot. Summ. J. at 11.) That regulation says: "Upon request, the Appeals Council shall give you and all other parties a reasonable opportunity to file briefs or other written statements about the facts and law relevant to the case. A copy of each brief or statement should be filed for each party." 20 C.F.R. § 416.1475. According to Smith, "the Appeals Council [does] not compl[y] with the spirit of this provision when it receives a brief, but then simply disregards it." (Pl.'s Mot. Summ. J. at 11.) The Court tends to agree: if the Appeals Council timely received the brief, 20 C.F.R. § 416.1475 suggests that the Council should have considered it.

The Court disagrees with Smith, however, as to the relief justified in this case for the

21

Council's alleged violation of § 416.1475. As an initial matter, this Court harbors substantial doubt as to whether a federal court has the authority to grant any relief. Sentence four of 42 U.S.C. § 405(g) grants a federal court the following jurisdiction: the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing *the decision of the Commissioner of Social Security*, with or without remanding the cause for a rehearing." (Emphasis added.) And, in this Circuit at least, where the Appeals Council denies review, the "decision of the Commissioner of Social Security" is the ALJ's. *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993) ("'[W]hen the Council has refused to review the case. . . . the decision reviewed in the courts is the decision of the administrative law judge.'" (quoting *Eads v. Secretary of Health & Human Servs.*, 983 F.2d 815, 818 (7th Cir. 1993))). Indeed, Circuit precedent suggests that a federal court lacks jurisdiction to review an Appeals Council decision denying a claimant's request to review an ALJ's decision. *Meeks v. Sec'y of Health & Human Servs.*, 996 F.2d 1215 (table) (6th Cir. 1993) ("An Appeals Council order denying review is not . . . a reviewable order; such an order serves only to make the decision of the ALJ the final reviewable decision of the Secretary."); *Perry ex rel. G.D. v. Comm'r of Soc. Sec.*, No. 1:11-cv-1121-JDT, slip op. at 14 (W.D. Tenn. Jan. 26, 2012) ("While Plaintiff suggests that this Court has power to review the Appeals Council's decisions where the Council fails to observe the procedural requirements of the regulations, *see Browning v. Sullivan*, 958 F.2d 817 (8th Cir. 1992), . . . the Sixth Circuit has not yet embraced the reasoning of her sister circuit"), *aff'd*, 501 F. App'x 425, 427 (6th Cir. 2012); *Muszynski v. Comm'r of Soc. Sec.*, No. 10-13590, 2011 WL 1899336, at *8 (E.D. Mich. Mar. 24, 2011) ("Plaintiff asks this Court to review the Appeals Council's decision to deny review and this Court is not authorized to do so, as it is the ALJ's Decision which became the final and reviewable decision of the Commissioner."), *report and*

*recommendation adopted*, 2011 WL 1899290 (E.D. Mich. May 19, 2011); *but see Mills v. Apfel*, 244 F.3d 1, 5 (1st Cir. 2001) (rejecting Commissioner's claim "that we may not review the Appeals Council even where it has given a mistaken reason for refusing further review.").

The Commissioner's position is that the foregoing authorities end the inquiry. (*See* Def.'s Mot. Summ. J. at 11-12.) But, the Court notes that none of the cases just cited are squarely on point. *See Cotton*, 2 F.3d at 696 (addressing whether a court may consider evidence submitted to the Appeals Council, but not the ALJ, when reviewing the final decision of the Commissioner); *Meeks*, 996 F.2d 1215 (table) (addressing claim that Appeals Council failed to complete a Psychiatric Review Technique form); *Perry ex rel. G.D.*, slip op. at 14 (addressing claim that Appeals Council's decision to deny review was merely a pro forma action that failed to evaluate the entire record); *Muszynski*, 2011 WL 1899336, at *8 (addressing claim that Appeals Council failed consider the "whole record," and failed to explain why claimant was not credible, in view of new evidence submitted to the Council).

Still, Smith cites no better authority; he instead "submits," without legal support, "that a finding that the ALJ's *decision* is the final order of the Commissioner should not insulate from review the Appeals Council's failure to follow its own *procedures*. The Council should not be permitted the complete freedom to ignore the Commissioner's binding regulations." (Dkt. 16, Pl.'s Resp. at 4-5.) Taking the arguments as presented then, this Court could reasonably conclude that Smith has not established this Court's jurisdiction to review the Appeals Council's decision denying his request for review.

But even assuming jurisdiction, Smith has not convinced this Court that the Council's assumed violation of § 416.1475 was harmful in his case. Two significant considerations convince

the Court of just the opposite. First is the nature of the Social Security administrative hearing process: it is non-adversarial and those acting on behalf of the Commissioner have a duty to develop the claimant's case.

> Although many agency systems of adjudication are based to a significant extent on the judicial model of decisionmaking, the SSA is perhaps the best example of an agency that is not. Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits, and the Council's review is similarly broad.

*Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) (Thomas, J. for four-justice plurality) (internal citations, quotation marks, and alterations omitted). Indeed, the Social Security regulations "permit—but do not require—the filing of a brief with the Council (even when the Council grants review), § 404.975, and the Council's review is plenary unless it states otherwise, § 404.976(a)." *Id.* at 111 (Thomas, J.). And the Commissioner does not typically submit a brief in support to the Appeals Council: "The Commissioner's involvement in the Appeals Council's decision whether to grant review appears to be not as a litigant opposing the claimant, but rather just as an adviser to the Council regarding which cases are good candidates for the Council to review pursuant to its authority to review a case *sua sponte*." *Id.* Further, the regulations provide that the Appeals Council will "'evaluate the entire record'" in determining whether to grant a claimant's request to review and will "'consider all of [the ALJ's] decision, even the parts with which [the claimant] may agree.'" *Id.* (quoting 20 C.F.R. § 404.970(b) and notice of decision that ALJ's provide unsuccessful claimants). Succinctly stated then, "[t]he Council, not the claimant, has primary responsibility for identifying and developing the issues." *Id.* at 112 (Thomas, J.).

Second, as the Commissioner points out, although the Appeals Council presumably did not consider Smith's January 2012 brief, it did consider a letter drafted by the same counsel from July

2010. (Def.'s Mot. Summ. J. at 10-11 (citing Tr. 15).) While the July 2010 letter does not present all the arguments set forth in the January 2012 brief (Pl.'s Resp. at 4), it does present the brief's primary argument: that the ALJ, despite his promise to do otherwise, did not consider the records submitted after the hearing (*compare* Tr. 8-10, January 2012 Brief, *with* Tr. 304-06, July 2010 Letter). As for the other arguments raised in the January 2012 brief, it is not clear why counsel could not have raised them in the July 2010 letter. Counsel says she sent that letter before she received the hearing CD. (Pl.'s Resp. at 4.) But the arguments in the January 2012 brief did not require the hearing CD. (*See* Tr. 10-11, January 2012 Brief (arguing that ALJ should have considered statement from Smith's mother, that ALJ did not account for certain findings by Dr. Sheth, and that the ALJ's limitation to "medium" work was not commensurate with Smith's severe impairments of scoliosis and knee pain).) Smith appears to concede that by July 2010, he had the ALJ's decision in hand. (*See* Pl.'s Resp. at 4.) With that decision and the medical record, counsel could have made the arguments in July 2010 that she later made in January 2012.

In sum, Smith's claim that the Court should remand to the Appeals Council to reconsider its decision to deny his request for review must pass three difficult hurdles. Initially, it is not certain that the Appeals Council in fact ignored the brief. But if it did, it is doubtful that this Court has the power to do anything about it. And if the Court does, this would not be the case to exercise that authority: the process before the Appeals Council is not adversarial, the Commissioner apparently submitted no brief to the Council, Smith was able to present his primary claim of error to the Council via earlier letters, and Smith offers no explanation for waiting a year-and-half to present additional claims not based on newly-discovered evidence. The Court thus believes that remand to the Appeals Council to redetermine whether it should grant review is unwarranted.

25

### C. Substantial Evidence Supports the ALJ's Residual Functional Capacity Assessment

Smith's last argument claims that the ALJ's residual functional capacity assessment—the ALJ's determination of what Smith could still do despite his mental and physical impairments, *see* S.S.R. 96-8p, 1996 WL 374184, at *2—is not supported by substantial evidence. (Pl.'s Mot. Summ. J. at 11-15.) This is so, says Smith, for three reasons. One: the ALJ placed undue weight on Dr. Rousseau's opinion and earlier PCC records, and thereby improperly discounted PCC records closer to his disability onset date. (*Id.* at 12.) Two: "the ALJ failed to adequately deal with the findings of [Dr. Sheth]." (*Id.* at 13.) Three: the evidence of his physical impairments does not support the ALJ's assessment that he could perform work at the "medium" exertion level. (*Id.* at 14-15.) None of these arguments demonstrate that the ALJ's functional capacity assessment lacks substantial evidentiary support.

Smith claims that the ALJ focused on a PCC report from 2006 indicating stability and decreased impulsive behavior without adequately considering PCC treatment records from 2007 and 2009. The 2009 records were submitted post-hearing and their relatively limited probative value has been discussed. As for the 2007 records, in December 2007, just months after his 18th birthday, Smith's PCC treaters described him as stable and "demonstrating good impulse control." (Tr. 263.) Thus, upon review of the 2007 and 2009 PCC records, the Court believes that the ALJ's reliance on Dr. Rousseau's opinion and the 2006 PCC records did not result in harmful error.

As for Dr. Sheth's specific restrictions, e.g., that Smith had moderate difficulties in concentration for extended periods, the ALJ was not required to include each of them in his residual functional capacity assessment. This is because, as discussed, Dr. Sheth's functional capacity assessment presumably accounted for his specific findings. *See e.g.*, *Ellis v. Comm'r of Soc. Sec.*,

12-11230, 2013 WL 1289270, at *7-8 (E.D. Mich. Feb. 11, 2013), *report and recommendation adopted*, 2013 WL 1283484 (E.D. Mich. Mar. 28, 2013). And that ultimate assessment was that, while Smith should avoid excessive social interaction, he otherwise retained the capacity to do "simple unskilled work on [a] sust[ained] basis." (Tr. 247.) The ALJ's residual functional assessment is in complete accord: "no useful ability to deal with the public, very limited but not precluded dealing with coworkers, being limited to simple, one or two step job instructions, task oriented, being restricted to low stress work." (Tr. 32.) The Court therefore does not find any error in the ALJ's consideration of Dr. Sheth's opinion.

Last, the record evidence offers little insight into Smith's physical impairments. Other than informing the ALJ that Smith had lower-back and right-knee pain, and that Smith underwent physical therapy for that pain, the record says little else. Notably absent is any assessment of Smith's physical functioning. As such, the ALJ reasonably placed considerable weight on the robust list of activities that Smith recounted to Dr. Rousseau. (Tr. 34-35 (citing Tr. 222).) Moreover, even if Smith is correct that substantial evidence does not support that he could perform work at the "medium" exertion level, the vocational expert testified that there would be jobs for someone with the same residual functional capacity but at the "light" exertion level. (Tr. 361.) The Commissioner raised this argument in her brief (Def.'s Mot. Summ. J. at 14); Smith has offered nothing specific in response (*see* Pl.'s Resp. at 5).

For these reasons, the Court finds no reversible error in the ALJ's residual functional capacity assessment.

27

## V. CONCLUSION AND RECOMMENDATION

As detailed above, Smith has not shown that evidence submitted after the administrative hearing justifies remand, that the ALJ's residual functional capacity assessment lacks substantial evidentiary support, or that relief is warranted for the Appeals Council's apparent failure to consider his brief. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 13) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 15) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the

response. E.D. Mich. LR 72.1(d)(3), (4).


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  July 18, 2013


## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 18, 2013.


s/Jane Johnson
Deputy Clerk